# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4922 | **DATE** | 3/11/2003 |
| **CASE TITLE** | Susan Liebig-Grigsby vs. United States of America | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Judgment is entered in favor of Plaintiff and against Defendant. Damages are awarded in the amount of $3,843,821.25. Parties are directed to submit additional brief or evidence, if any, concerning Plaintiff's future economic loss, within 21 days.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **3** number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | MAR 12 2003 date docketed | |
| | Notified counsel by telephone. | | | 22 |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | date mailed notice | |
| | Copy to judge/magistrate judge. | | | |
| ETV | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | ETV mailing deputy initials | |

DOCKETED

MAR 1 2 2003

SUSAN LIEBIG-GRIGSBY,            )        No. 00 C 4922
                                )
        Plaintiff,              )
                                )
        v.                      )        No. 00 C 4922
                                )
UNITED STATES OF AMERICA,        )       Judge Rebecca R. Pallmeyer
                                )
        Defendant.              )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Susan Liebig-Grigsby, suffers from cervical myelopathy. She had good results from surgery on her spinal cord at the Hines Veterans Administration Hospital in 1995. Two years later, when she presented with symptoms indicating the need for further surgery, VA doctors failed to refer her to a neurosurgeon, and her condition deteriorated severely. Her mobility and sensation now substantially impaired, Plaintiff brought this two-count complaint for medical negligence against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346 and §§ 2671-2680. The first count alleges that Veteran's Administration staff failed to properly treat the Plaintiff's progressive neurological dysfunction, resulting in loss of feeling and muscle ability in Plaintiff's legs and right arm. The second count alleges spoliation of evidence, specifically, two volumes of Plaintiff's medical records. The court conducted a bench trial in December 2001 and now finds in Plaintiff's favor, but reserves a final award of damages pending further information from the parties regarding Plaintiff's projected future healthcare costs.

## FINDINGS OF FACT

The Plaintiff was born on March 22, 1945. (Plaintiff's Modified Final Pretrial Order/Trial Brief at 2.) She served in the United States Army from 1962 to 1963, when she was honorably discharged. Since at least 1995 the Plaintiff was a patient at VA facilities in the Chicago area: Westside Medical Center (occasionally in its Women's Health Clinic) and Edward J. Hines Hospital.

22

## A. Diagnosis and Treatment of Plaintiff's Cervical Myelopathy in 1995

In 1995, Plaintiff sought treatment for neck pain at Westside. After a few visits with Dr. Karen Davis, in October 1995 Plaintiff was referred to Dr. Gwenn Garmon, an internal medicine physician at Westside.[1] (Testimony of Dr. Gwenn Garmon.) Dr. Garmon performed a physical examination and observed muscle weakness in the Plaintiff's lower extremities, which she thought might be a result of myelopathy, an abnormality in the connection between nerves and muscle groups. (Id.) Dr. Garmon noted that Plaintiff had a difficult gait, walked unsteadily, and was unable to feel temperature change. Because these neurological symptoms represented a marked change from observations Dr. Davis had made only two days earlier, Dr. Garmon referred Plaintiff to a neurologist on an emergency basis and directed Plaintiff to use a wheelchair. (Id.)

Plaintiff saw a neurologist at Westside, Dr. Christina Orfei, on October 18, 1995. In her examination, Plaintiff complained to Dr. Orfei of weakness, numbness and coldness in her arms and hands, and severe pain in her neck and back. She also exhibited unsteady gait and reported having fallen several times in the recent past. (Testimony of Dr. Orfei.) Dr. Orfei's examination revealed severe hyperreflexia in the lower extremities with associated clonus in both lower extremities. Her hands were weak as well, with their strength measuring at 3/5 on the right and 4/5 on the left.[2] (Expert Report of Jack Wilberger, Pl.'s Ex. 8.) Dr. Orfei diagnosed Plaintiff as suffering from cervical myelopathy.

Cervical myelopathy is a dysfunction or malfunction of the spinal cord which results from cervical spondylosis, an arthritic condition that many people develop as they age, in which bone spurs form in the direction of the spinal cord, causing pressure against nerve roots or the spinal cord. (Testimony of Dr. Christina Orfei and Dr. James Wilberger.) Symptoms of this disease are

---

[1]    The exact dates of these visits have not been supplied to the court.

[2]    Dr. Orfei explained that 2/5 represents severe weakness; 3/5 is moderate weakness; 4/5 is mild weakness; and 5/5 means the patient has full strength in a particular muscle or limb.

spasticity (muscle contractions while the body is at rest), hyperreflexia (a condition in which the deep tendon reflexes are exaggerated), and clonus (a form of movement characterized by contractions and relaxations of muscle occurring in rapid succession). (Id.)

Having detected these symptoms in Plaintiff, Dr. Orfei ordered an urgent magnetic resonance imaging ("MRI"). (Testimony of Dr. Orfei.) Dr. Jack Wilberger,[3] an expert witness for the Plaintiff, examined the results of that cervical MRI scan (done on October 25, 1995) and found it to show significant and severe cervical stenosis (stricture in the neck vertebrae) at both the C4-5 and C5-6 levels of the vertebrae. (Testimony of Dr. Wilberger.) In addition, he noted a hyperintense signal[4] within the spinal canal behind the C4-5 disc space consistent with what is typically seen with prolonged severe compression of the spinal cord. (Id.)

Dr. Orfei concluded that Plaintiff needed immediate surgery to correct the severe pressure on her spinal cord. Because Westside does not have a neurosurgery department, Dr. Orfei transferred Plaintiff to Hines, where, on November 3, 1995, Plaintiff underwent extensive anterior cervical surgery. (Id.) Plaintiff's operation report reflected that there were no complications during surgery. (Pl.'s Ex. 1, p. 4-7.) Her discharge summary, dictated on November 11, 1995, typed on November 21, 1995, and signed by a Dr. D. Anderson, included the following statement: "clonus and myelopathic signs were all but completely resolved by postoperative day #2." (Pl.'s Ex. 1, p. 16.) The summary also noted that the Plaintiff was able to walk without any difficulty. (Id.)

B.    Follow-up to 1995 Surgery

The Plaintiff received follow-up treatment approximately six times at Hines from the point

---

[3]    Dr. Wilberger is acting chairman of the neurosurgery department at Allegheny General Hospital in Pittsburgh, Pennsylvania, and the vice dean of the Hahnemann University School of Medicine. He received his medical degree in 1978 from Virginia Commonwealth University and has held several hospital and academic appointments over the course of his career.

[4]    Neither party has explained this term, but the court understands it is a symptom of acute spinal dysfunction.

of her discharge through some time in September 1996. (Expert Report of Dr. Wilberger.) With few exceptions, the records of these visits showed that Plaintiff's condition had improved. (*Id.*) In July 1996, a physician from the neurosurgical clinic noted that there had been "postoperative deterioration"[5] and did recommend a new MRI scan of the cervical scan, as well as an evaluation by a neurologist to "rule out neuropathy or myopathy [skeletal muscle disease]." (Expert Report of Dr. Wilberger.)

Plaintiff did see a neurologist, Dr. John Wilson, on August 28 1996.[6] Although Dr. Wilson noted at that time that Plaintiff "has not improved with decompression," Dr. Wilberger noted that the conclusion was inconsistent with other records, except the one from July 1996. (*Id.*) Dr. Wilson conducted a detailed neurological examination and found that the Plaintiff's upper extremity strength was 5/5, which, Dr. Wilberger observed, was a significant improvement to Plaintiff's preoperative condition. (*Id.*) Dr. Wilson also noted that Plaintiff had greater strength in her lower extremity as well. Her reflexes were recorded as 3/4, no clonus was detected, and no pathological reflexes were found. (*Id.*) Dr. Wilberger determined these signs all indicated the 1995 surgery had been beneficial. (*Id.*)

An MRI scan was also performed on July 22, 1996, and the results showed no residual significant compression at the operative site, nor any significant ongoing spondylitic disease (inflammation of the vertebrae) at any other site. (*Id.*) According to Dr. Wilberger, the July 1996 MRI results demonstrated that Plaintiff's surgeons had successfully removed several pieces of

---

[5]     Plaintiff does not identify the medical report detailing this visit. Among Defendant's exhibits, however, is a "progress note" about Plaintiff dated July 1, 1996, stating: "diagnosed post-op deterioration." (Def.'s Ex. 1(E), p. 312.) However, the court cannot read the signature of the health care provider who wrote this note.

[6]     Plaintiff has not pointed to a medical record documenting this visit with Dr. Wilson, and the court is uncertain of where this exam was conducted. The court presumes this is the same Dr. Wilson who testified during the trial, a neurologist who was employed at Hines from 1994 through 1997.

bone and replaced them with a metal plate to fuse her vertebrae. (Testimony of Dr. Wilberger.) The scan showed that the pressure on Plaintiff's spinal cord had been significantly relieved and the hyperintense signal had disappeared. (*Id.*) Again, according to Dr. Wilberger, the lack of compression reflected in the 1996 MRI was evidence that the initial surgery was successful. (*Id.*)

Dr. Wilson again examined the Plaintiff in October 1996. (Testimony of Dr. Wilson). He noted that her signs of myelopathy had improved and she was able to walk, sit, stand, and easily move from sitting to standing position. There was no evidence of hyperreflexia or clonus, and her reflexes were uniformly 3/4 (a good sign, in Dr. Wilson's view). (*Id.*) Because she continued to complain of pain, however, and because he wanted to be sure there were no signs of radiculopathy (*disorder of the spinal nerve roots*) that were not clinically apparent, Dr. Wilson recommended that Plaintiff undergo an EMG (electrical test of Plaintiff's muscles). (*Id.*) The evidence does not reveal whether she did so. (*Id.*)

## C.     Plaintiff's Deterioration in 1997

On April 7, 1997, a psychiatrist named Dr. Yan examined Plaintiff at Westside and noted that Plaintiff was having trouble ambulating. According to Dr. Yan's report, Plaintiff exhibited hyperreflexia, clonus, and deterioration of gait. (Testimony of Dr. Orfei.) The clonus in Plaintiff's lower extremities represented a significant worsening from the time she was operated upon and the time that she was seen by Dr. Wilson a few months previously. (Expert Report of Dr. Wilberger, Pl.'s Ex. 8.) Dr. Orfei testified that in this precarious condition, a patient could seriously injure herself if she fell. (Testimony of Dr. Orfei.) Dr. Yan's only recommendation was that Plaintiff consider using a wheelchair. (*Id.*) The record does not indicate whether Plaintiff took Dr. Yan's advice; Plaintiff testified she has been using a wheelchair since October 1997. (Testimony of Liebig-Grigsby.)

Plaintiff did suffer a fall soon after the visit, and on April 10, 1997, Plaintiff went to the

surgical clinic at the Westside VA where Dr. Garmon treated her for her injuries. (Testimony of Dr. Garmon.) At this visit, Plaintiff presented the same symptoms she had in October 1995, before her surgery. Her knees were unstable; she had experienced falls in addition to the most recent one; and she suffered from fatigue, insomnia, and incontinence. (*Id.*) Although Plaintiff remained able to walk, she was noted to have weak grips bilaterally and bilateral weakness of her lower extremities. (Expert Report of Dr. Wilberger, Pl.'s Ex. 8.) Cervical spine x-rays showed significant bone loss at the C4-5 level with complete loosening of the second and third screws of the Orion plate system and early partial loosening of the first and fourth screws.[7] (*Id.*)

Dr. Garmon testified that the symptoms exhibited by the Plaintiff on April 10, 1997 were of the type that should be referred to a neurologist. Nevertheless, Dr. Garmon did not make such a referral. She testified that she did not do so because Plaintiff told Dr. Garmon that she was already scheduled to see a neurologist the following week. (*Id.*) Dr. Garmon asked the Plaintiff to come back to see her two weeks later for a follow-up. (*Id.*) She also made a note of her intention to recommend to the neurosurgery team at Hines that the Plaintiff be put back on Baclofen, a muscle relaxer and anti-spastic drug, as the Plaintiff had stopped taking the medication when she had surgery in 1995. (Pl.'s Ex. 1, p. 40.) Dr. Garmon also reported that she "would like to consolidate care here – unfortunately can't transfer over entirely at this time as neuro surg and heart surg only at Hines – will however obtain their plan of action through letters, hopefully." (*Id.* at 41.) VA records show Plaintiff did not see Dr. Garmon for a follow-up visit. She cancelled an April 22, 1997 appointment at Hines (the record does not identify the doctor she was scheduled to see) and an April 24, 1997 appointment with Dr. Garmon. (Pl.'s Ex. 3.) Plaintiff apparently did see doctors at both Westside and Hines on April 28, 1997, however. (*Id.*)

---

[7] Although these terms have not been defined for the court, the court interprets them to mean that the metal plates that were inserted during the 1995 surgery were loosening. The court is unaware of who ordered these x-rays or when they were taken.

There was little evidence submitted regarding the Plaintiff's physical condition between April and October 1997. Notes made by Marianne Olenych, a registered nurse at Westside, reflect that the Plaintiff was experiencing psychological ups and downs during this period, and the records indicate she was examined at either Westside or Hines approximately eight times. (Pl.'s Ex. 3.)

## D.    Further Treatment in Late 1997

In October 1997 Plaintiff fell backward down a flight of stairs at her son's home and went to Westside for treatment, where she saw Dr. Orfei for the first time since before her surgery in 1995. (Testimony of Liebig-Grigsby.) Dr. Orfei observed that the Plaintiff again exhibited hyperreflexia, unsteady gait, and loss of balance. Because Plaintiff had experienced a fall, Dr. Orfei ordered an x-ray. (Testimony of Liebig-Grigsby.) The x-ray revealed no fractures, but because it showed loosening bones and screws in Plaintiff's neck, Dr. Orfei determined to refer Plaintiff to Hines. She called Hines neurosurgery and spoke to someone who described himself as the "attending physician," and advised Dr. Orfei that "the solidity of the spine depends mainly on bone fusion and they all get loose due to bone reabsorption."[8] (Testimony of Dr. Orfei.) After this conversation, Dr. Orfei advised the Plaintiff to see a neurosurgeon and provided her with a wheelchair. Plaintiff testified that she has been using a wheelchair ever since.[9] (Testimony of Liebig-Grigsby.)

Dr. Orfei testified, based on her own recollection and notes of Plaintiff's psychiatric nurse, that the Plaintiff did in fact see a neurosurgeon at Hines in October 1997 and discussed the surgical spine x-ray results with a neurosurgeon. (*Id.*) There is nothing in the record documenting such a conversation, but there is evidence that Plaintiff saw a neurosurgeon, Dr. McGregor, at

---

[8]    The court is uncertain of the significance of this statement, nor is the court sure what "they" refers to.

[9]    The record does not indicate whether the Plaintiff was completely unable to walk at this time.

Hines on October 27, 1997. (Def.'s Ex. 1(A), p. 114-15, Def.'s Ex. 1(C), p. 384.) In a session with Ms. Olenych, Plaintiff described her visit with Dr. McGregor as horrible. The Plaintiff stated she felt abandoned and unattended to by the Hines staff, and was very upset by Dr. McGregor's assessment of her condition: Plaintiff reported that Dr. McGregor said that she had deteriorated, that her condition would worsen and could not be treated further, and that she would require a motorized wheelchair to help her get around. (Def.'s Ex. 1(A), p. 114.) She also expressed to Ms. Olenych that she did not want to go to Hines because when she was hospitalized there in 1995 her roommate had committed suicide.[10] (Def.'s Ex. 1(A), p. 116.)

In November 1997, Dr. Orfei examined the Plaintiff again, and observed that she was at that point "able to stand, but not safely ambulate," and that she exhibited spasticity and weakness. (Expert Report of Dr. Wilberger, Pl.'s Ex. 8.) Plaintiff's lower extremity strength was graded at 3/5, and her left arm strength was the same, but Plaintiff was not using her right arm (it was apparently in a sling). No clonus was documented, but her deep tendon reflexes were found to be significantly hyperactive. Dr. Orfei ordered an MRI and an EMG. (Testimony of Dr. Orfei.)

A cervical MRI scan, performed on December 2, 1997, showed Plaintiff's condition had worsened since her July 1996 MRI, which had revealed no abnormalities. (Testimony of Dr. Orfei.) Nevertheless, Dr. Orfei did not feel that surgery was in order at that time. (Id.) Dr. Wilberger's

---

[10]     Plaintiff did not testify about her visit with Dr. McGregor at trial, nor was Dr. McGregor called as a witness. The record contains only sketchy evidence showing that Dr. Orfei confirmed Dr. McGregor's October 27, 1997 examination of the Plaintiff. Ms. Olenych's notes of October 28, 1997 begin by describing Plaintiff's reaction to Dr. McGregor's examination, and then further down the page state: "Dr. Orfei was contacted to verify the visit. She confirmed most except that there was no mention of further deterioration, and no treatment meant that no further surgical procedures would be helpful at this time." (Def.'s Ex. 1(A), p. 114.) Even if the court were to assume this refers to Dr. McGregor's assessment, there is no evidence that Dr. Orfei was present for the exam or that she spoke with Dr. McGregor about Plaintiff's prognosis. Dr. Orfei testified that she has no independent recollection of such a conversation. (Testimony of Dr. Orfei.)

assessment was quite different. He noted that the MRI showed "significant artifact"[11] from C4 to C6 subsequent to Plaintiff's 1995 surgery. (Expert Report of Dr. Wilberger, Pl.'s Ex. 8.) Dr. Wilberger observed severe stenosis at C3-4 and C6-7 above and below the site of the previous surgery. In addition, he noticed a hyperintense signal within the spinal cord at approximately the C5 level, evidence of ongoing severe compression of the spinal cord. (*Id.*) Dr. Wilberger explained that the stresses and strains above and below the site of surgery over time can lead to development of additional bone spurs causing a second series of compressions, resulting in new conditions and requiring attention. (Testimony of Dr. Wilberger.) Dr. Orfei herself observed that the two signals of compression above and below the surgery site, reflected in the 1997 MRI, was an even worse sign than the results of the 1995 MRI. (Testimony of Dr. Orfei.) Dr. Orfei nevertheless did not send the MRI scan to a neurosurgeon, nor did she refer the Plaintiff to a neurosurgeon for examination. (Testimony of Dr. Orfei.) Dr. Orfei determined that surgery would probably not help the Plaintiff, and did not advise the Plaintiff one way or the other. (*Id.*) Instead, Dr. Orfei determined the best course was one of conservative treatment and maintenance of Plaintiff's muscle strength through physical therapy and exercise. (*Id.*)

Dr. Orfei acknowledged in her testimony that one of the reasons she did not take the Plaintiff's condition more seriously was her failure to go back and review the Plaintiff's records from postoperative 1995 through 1997 when she saw the Plaintiff again. Dr. Orfei explained it was difficult for doctors at Westside to access records from Hines. (*Id.*) If she had, Dr. Orfei stated, she would have seen the significant deterioration that had occurred in the Plaintiff after her apparently successful surgery. Instead, Dr. Orfei diagnosed the same conditions she had seen in the Plaintiff's myelopathic state as of 1995. (*Id.*) Dr. Orfei also asserted candidly that in 1997, the

---

[11]    The court interprets "significant artifact" to mean that Plaintiff's cervical myelopathy caused her spinal cord to appear extremely different from healthy patients, but is unsure whether Dr. Wilberger meant something more specific.

Plaintiff's stenosis was decompressable, and surgery could have taken pressure off the spinal cord which might have improved the Plaintiff's worsening myelopathy. (*Id.*)

The Plaintiff testified that at no point during 1997 did any doctor speak with her about the possibility of a second surgery to treat her condition. She asserted that if she had been advised that surgery was a viable option, she would have agreed to it immediately. (Testimony of Liebig-Grigsby.)

## E.    Plaintiff's Condition Since 1997

Dr. Orfei examined the Plaintiff at least three times in the first few months of 1998, and diagnosed clonus of ankles and chronic cervical myelopathy. As of July 1998, Plaintiff's foot everters (muscles) were at 2/5. (Def.'s Ex. 1(A), pp. 79, 80, 84, 88, 90.)

In March 1998, Plaintiff began seeing Dr. Murray Scheinman, her mother's doctor of several years, as her regular physician. (Testimony of Dr. Murray Leon Scheinman.) When she first went to see him, the Plaintiff wore a neck brace and exhibited hyperreflexia. (*Id.*) Dr. Scheinman has never seen the Plaintiff's records from the VA, although he requested that Plaintiff have them sent to him. (*Id.*) He is aware, however, of the 1995 surgery. When Plaintiff saw him in April 1998, she complained of constant severe pain. Dr. Scheinman recommended an evaluation at the spine center at Weiss Hospital, as well as a visit to a neurosurgeon. (*Id.*) Plaintiff later told Dr. Scheinman that she could not afford to get treatment for her spine condition from the specialists at Weiss, and was being treated at the VA. Dr. Scheinman has seen the Plaintiff between 12 and 15 times. He testified that her left hand (the "good" hand) is numb and weak, and she does not have the use of her right arm or legs. She has also experienced a loss of sensation in general; has pain in her neck, back, and arm; and suffers from depression. (*Id.*) He believes that her condition is permanent.

Dr. Scheinman concluded, based upon his medical training and his visits with the Plaintiff,

that she has experienced serious pain over the past few years, and will continue to experience future pain and suffering for the rest of her life. (*Id.*) He predicted that she will live a normal life span. (*Id.*) Her conditions will require continuous nursing care, medication, medical follow-up, and psychiatric care, and Dr. Scheinman warned that her physical limitations could become more serious. (*Id.*) Finally, Dr. Scheinman hypothesized that if the Plaintiff had received surgery when she was still able to walk, she would probably not be in a wheelchair permanently. (*Id.*)

In fact, by November 1998, Plaintiff was completely wheelchair bound because of her inability to walk, severe spasticity and weakness in her lower extremities.[12] (Expert Report of Dr. Wilberger, Pl.'s Ex. 8.) Dr. Orfei testified that the Plaintiff's dependence on a wheelchair is permanent, and predicted that she will have recurrent urinary tract infections, ulcers and additional deterioration of her spinal cord. (Testimony of Dr. Orfei.) She is now effectively paralyzed in her lower limbs and right arm, and since 1997 suffers from chronic daily pain, which interferes with sleep and requires her to take Fiorocet, a strong prescription pain reliever. (Testimony of Dr. Scheinman.) Plaintiff testified that she is losing strength and feeling in her left arm, has a hard time sensing heat or cold, and worries about possible burns and other injuries. (*Id.*)

By August 1999, Dr. Scheinman recommended nursing care for the Plaintiff (she previously lived with her elderly mother). Plaintiff moved into the Warren Park Pavilion, a nursing facility in Chicago's Rogers Park neighborhood on April 6, 2001. (*Id.*) Dr. Scheinman is not on the staff there but did visit the Plaintiff twice before turning her care over to the doctors at Warren Park. (*Id.*) At Warren Park, Plaintiff shares a room and adheres to a rigid schedule. (Testimony of Liebig-Grigsby.) She finds the lack of privacy there, particularly when it comes to bathing and using the toilet, humiliating. She requires assistance dressing herself and eating. (*Id.*) She would much prefer living in a private home with nursing assistance, mainly because she would have more

---

[12]     It is not clear to the court exactly when the Plaintiff became entirely dependent on a wheelchair, but surmises that it was sometime between October 1997 and November 1998.

freedom and privacy. (*Id.*) She also described being isolated at Warren Park. Due to her physical limitations, she cannot participate in many of the activities offered for Warren Park residents. (*Id.*) None of the other residents are close to her age, and many are of "unsound mind." (*Id.*) She is unable to visit her sons and testified that she would be spending Christmas at the nursing home. (*Id.*)

Scott Grigsby, one of Plaintiff's sons, testified that whenever he sees his mother she complains of pain. (Testimony of Scott Grigsby.) He compared her current state to her condition in previous years, when she was able to walk, hug his children and play games with them, including bowling and catch (although he did not say when she was last capable of participating in these activities). Now, she cannot bathe herself or go out socially. She has trouble taking care of daily needs such as shopping. Aside from one visit to his house, Plaintiff is only able to see her grandchildren when they come visit her at the nursing home, two to three times per month. (*Id.*)

F.    **Missing Medical Records**

When the Plaintiff originally filed her administrative claim with the VA, it was discovered that some of her medical records were missing. (Dec. 30, 1999 Letter from Earl E. Parsons, Staff Attorney, VA to John Perconti, Pl.'s Ex. 21.) Stephen Geist, a VA staff attorney, compiled Plaintiff's medical records in connection with her administrative claim, and found only seven of what he believed were nine volumes. (Testimony of Mr. Geist.) Mr. Geist believes the missing records reflected Plaintiff's treatment at Westside and Hines (perhaps, the court surmises, including records of Plaintiff's October 27, 1997 visit to Hines neurosurgery). (*Id.*) Dr. Penn, the government's expert witness, testified that without those records he is unable to determine whether VA medical staff violated the standard of care. (Testimony of Dr. Penn.) Defendant has not explained how the records were lost, apart from Mr. Geist's unsupported hypothesis that Plaintiff herself removed them.

## G.     Testimony Regarding Standard of Care

Dr. Orfei testified that for patients who suffer from cervical myelopathy, the proper standard of care requires neurologists to make MRI results available to neurosurgeons. (Testimony of Dr. Orfei.) Assuming that the Plaintiff did see Dr. McGregor on October 27, 1997, Dr. Orfei stated that without viewing her MRI, Dr. McGregor could not have decided whether surgery was appropriate because neurosurgeons do not make decisions regarding surgery without first consulting an MRI. (*Id.*) Dr. Orfei acknowledged that she should have sent the Plaintiff's MRI to a neurosurgeon after December 2, 1997, but explained that she did not send the results of the Plaintiff's December 1997 MRI to Hines neurosurgery because, in her judgment, Plaintiff's MRI did not show that she required "critical care." She conceded, however, that this contradicted her deposition testimony that Plaintiff's MRI should have been reviewed by a neurosurgeon. (*Id.*)

Dr. Wilson, called as a witness by the Plaintiff, agreed with Dr. Orfei that not every MRI must be seen by a neurosurgeon, and that not all cervical myelopathy patients are good candidates for surgery. He noted, however, that when a physician detects hyperintensity in the spinal cord, the proper standard of care does require referral to a neurosurgeon. Dr. Wilson explained that compression is seldom treatable with injections or medications. Tissue compression is calcified and hard and must be scraped out surgically. (Testimony of Dr. Wilson.)

Dr. Wilberger agreed that worsening symptoms in a patient with cervical myelopathy can only be treated with surgery. (Testimony of Dr. Wilberger.) If a patient exhibits weakness in her hands, difficulty walking, hyperintense signal, or clonus, a neurosurgeon would be obligated to recommend surgery because there is no other medical treatment for the disorder. (*Id.*) Dr. Wilberger testified that the primary purpose of surgery in such situations is to prevent the patient's condition from worsening. He estimated that 70-80% of the time, surgery serves to stabilize patients. In another 10% of cases surgery actually leads to improvement in the patient's condition.

Even more seldom, a patient will improve dramatically as a result of surgery. (*Id.*)

Dr. Wilberger believes, given these statistics and Plaintiff's history of benefitting from her first surgery, that a second surgery would have helped the Plaintiff. (*Id.*) In Dr. Wilberger's judgment, because Plaintiff was walking in 1997, the window of opportunity for such surgery was open until at least mid-1998. The MRI scan from December 1997, according to Dr. Wilberger, showed a surgically correctable problem. The risk of an adverse outcome (such as paralysis or infection) from surgery at that time was only 3-4%. The window of opportunity closed when the Plaintiff's condition deteriorated to the point where she could no longer ambulate, and the risk of surgery became higher than the chance of improvement. (*Id.*) Given that the Plaintiff is currently confined to a wheelchair, Dr. Wilberger testified that surgery is no longer an option for her. (*Id.*)

In Dr. Wilberger's view, Plaintiff's VA doctors violated the standard of care in their treatment of her. With respect to Dr. Garmon, Dr. Wilberger observed that she did an excellent job in 1995 but, surprisingly, did not follow through with the Plaintiff when she returned in 1997. After Plaintiff's April 10, 1997 visit, according to Dr. Wilberger, the standard of care required that Dr. Garmon refer the patient to a neurologist or neurosurgeon in a timely fashion. (*Id.*) Dr. Garmon should have made sure there was a referral to a neurologist and, given the severity of Plaintiff's condition, should have followed up to make sure that Plaintiff actually did see a neurologist. (*Id.*)

Dr. Orfei also violated the standard of care for neurologists, according to Dr. Wilberger, because she assumed in 1997 that the Plaintiff's condition had not changed since 1995, the last time she saw her. Dr. Penn, an expert witness for the United States, agreed that it was important for Dr. Orfei to know the Plaintiff's full neurological history. (Testimony of Dr. Penn.) It is disputed whether Dr. Orfei referred the Plaintiff to a neurosurgeon in October 1997; even if she did, Dr. Wilberger noted, there is no evidence that Dr. Orfei followed up with a neurosurgeon, as she should have. (Testimony of Dr. Wilberger.) Dr. Orfei's failure to refer Plaintiff to neurosurgeon following her December 1997 MRI is not disputed. That failure, according to Dr. Wilberger, was a clear

14

violation of the proper standard of care. (*Id.*) Assuming that Dr. McGregor did examine the Plaintiff at Dr. Orfei's request, Dr. Wilberger testified that he could not have made an informed decision regarding whether surgery was appropriate for the Plaintiff without reviewing an MRI or a myelogram (an x-ray of the spinal cord). Dr. Wilberger testified, further, that more complete records of the Plaintiff's visit with Dr. McGregor would not likely change his opinion; the fact that no follow through occurred after December 1997, and that the neurosurgeon did not order an MRI, establishes that the standard of care was violated. (*Id.*) Each of these violations of the standard of care harmed the Plaintiff, in Dr. Wilberger's view, because they deprived her of the opportunity for an intervention that could have stabilized or perhaps improved her condition.[13] (*Id.*)

Defendant's expert witness, Dr. Richard Darren Penn, challenged Dr. Wilberger's conclusions in part. Dr. Penn testified that because there is no record indicating whether the Plaintiff was ever examined by a neurosurgeon in October 1997, it is impossible to determine whether the standard of care was violated at that time. (*Id.*) In any event, Dr. Penn disputed that surgery would have been helpful to Plaintiff. Based on the fact that the Plaintiff continued to show the same amount of decompression above and below the surgical site, he concluded that the disease was progressing in spite of good decompression, and that further surgery might not have been effective in alleviating her symptoms. (Testimony of Dr. Penn.) He explained that sometimes when a person's blood supply is compromised, she will suffer from ischemic injury (paralysis due to loss of blood circulation). If this was the cause of the Plaintiff's continued deterioration, further surgery would not have been helpful. (*Id.*) On cross-examination, Dr. Penn conceded that the first surgery did appear to successfully decompress a portion of the Plaintiff's spinal cord, and that there

---

[13] Although he did not say that the lack of coordination was a violation of the standard of care for physicians, Dr. Wilberger also criticized the VA doctors' failure to share information about her with each other. (Testimony of Dr. Wilberger.) He found no evidence that the Plaintiff's caregivers were significantly concerned by their observations, nor could he find evidence of coordination of the care regarding her evolving neurologic signs and symptoms. (Expert Report of Dr. Wilberger, Pl.'s Ex. 8.)

was no evidence of any ischemic injury. (*Id.*) Dr. Penn nevertheless remained skeptical concerning the value of a second surgery. He noted Dr. Wilberger's testimony that only one in ten patients improve after surgery. The fact that Plaintiff had been "lucky" the first time does not mean that a second surgery would be successful. (*Id.*) According to Dr. Penn, the second surgery often produces worse results, because the surgery does not affect the natural course of the disease, and there was a risk that surgery would have worsened her condition. (*Id.*)

Dr. Penn also suggested that Plaintiff's precarious psychological state contributed to the difficulty in providing care for her. Since at least 1995 Plaintiff has been treated for a variety of psychiatric problems and has expressed suicidal thoughts. (*Id.*) She sometimes failed to appear for scheduled appointments, which further contributed to the difficulty treating her. (*Id.*) Dr. Penn hypothesized that Plaintiff's occasional missing of appointments may have been a factor in her doctors' failure to suggest a second surgery for her, but he acknowledged that the records indicated that Plaintiff did not miss any appointments after October 1997. (*Id.*) Dr. Penn also questioned whether Plaintiff would even have consented to a second surgery, but he conceded that there was no evidence she ever ignored her doctors' recommendations. (*Id.*) Dr. Penn conceded, further, that he could not say to a reasonable degree of medical certainty that Plaintiff's behavior contributed to her not having surgery. (*Id.*)

Finally, Dr. Penn pointed out that there is no consensus regarding the appropriate standard of care to be applied in this case. Among ten neurosurgeons, Dr. Penn believes, there might be three or four different ideas about how best to treat the Plaintiff, with the most aggressive of them recommending surgery. (*Id.*) Significantly, however, Dr. Penn is unaware of any case in which surgery was performed on a patient with cervical myelopathy, the patient's condition subsequently worsened, and a second surgery was not recommended. (*Id.*) Nor did he elaborate on the other potential treatments for Plaintiff, or their likely results. Dr. Penn did not testify that surgery was contra-indicated for Plaintiff, nor did he testify that, to a reasonable degree of medical certainty, a

16

second surgery would not have helped her.

Although he was not called as a witness, Dr. Terry Lichtor, a VA neurosurgeon, reviewed Plaintiff's case when she filed her administrative claim in 1999. In Dr. Lichtor's opinion, Plaintiff should have been re-evaluated by a neurosurgeon when her condition began to deteriorate in the fall of 1997. Dr. Lichtor believes that further surgery might have prevented the progression of her symptoms; he observed that "it is certainly not unusual for patients to require more than one procedure in treatment of progressive cervical myelopathy." (April 21, 1999 Memorandum from Dr. Lichtor to Acting Chief of Staff, VA, Pl.'s Ex. 20.)

## DISCUSSION

The Federal Tort Claims Act provides a remedy for personal injury caused by the negligent or wrongful act or omission of government employees while acting within the scope of employment. The government is liable in the same manner and to the same extent as a private individual in accordance with the law of the state where the cause arose. 28 U.S.C. §§1346(b), 2671, and 2674.

In a medical malpractice case based upon negligence, the burden is on the plaintiff to prove the following elements of a cause of action: a duty owed by the physician to the plaintiff; the proper standard of care against which the defendant's conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a resulting injury proximately caused by the physician's want of skill or care. *Purtill v. Hess,* 111 Ill.2d 229, 241-42, 489 N.E.2d 867, 872 (Ill. 1986) (citations omitted). The parties do not dispute that the physicians at Westside and Hines VA facilities owed Plaintiff a duty of care. The court will therefore address the Plaintiff's contentions that the appropriate standard of care was breached in her case and that she was injured as a result.

17

## A.    Whether Plaintiff's Physicians Breached the Appropriate Standard of Care

In a medical malpractice action, the standard of care against which a defendant's conduct is measured is not the highest degree of skill possible, but the reasonable skill which a physician in good standing in the community would use in a similar case. *Newell v. Corres*, 125 Ill.App.3d 1087, 1094, 466 N.E.2d 1085, 1090 (1st Dist. 1984). Unless the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care and the defendant physician's deviation from that standard. *Purtill*, 111 Ill.2d at 241-42, 489 N.E.2d at 872. With regard to specialists, Illinois law provides: "A [physician] who holds himself out as a specialist and provides services in his specialty must possess and apply the knowledge and use the skill and care ordinarily used by a reasonably well-qualified specialist [practicing in the same or similar localities] under circumstances similar to those shown by the evidence. A failure to do so is professional negligence." Illinois Pattern Jury Instructions, Civil, No. 105.02 (3d ed. 1995). *See also Adami v. Belmonte*, 302 Ill.App.3d 17, 26, 704 N.E.2d 708, 714 (1st Dist. 1998).

Plaintiff believes the evidence establishes a violation of the standard of care. Plaintiff points out that both Dr. Garmon and Dr. Orfei acknowledged they made mistakes while caring for Plaintiff, and neither testified that they met the standard of care. Dr. Wilberger reached the same conclusion, and the government's own expert, Dr. Penn, conceded that he did not know of a case similar to Plaintiff's in which the patient was not offered the option of a second surgery.

The government maintains that when expert testimony demonstrates that alternative methods of treatment are proper, the choice by a physician of one method over another, even where injury results, is not a deviation from the standard of care. *Newell*, 125 Ill.App.3d at 1094, 466 N.E.2d at 1090. Assuming this is an accurate statement of the law, however, Dr. Penn's testimony does not satisfy the court that there was an appropriate alternate treatment in this case.

18

Dr. Penn himself asserted that because the records of Plaintiff's neurosurgical treatment at Hines in 1997 are missing, it is impossible to determine whether the standard of care was violated. Without the benefit of those records, Dr. Penn could only hypothesize that surgery might not have been effective for Plaintiff. Dr. Penn noted that a group of neurosurgeons would have a variety of ideas about how to treat the Plaintiff, but he did not explain what those alternatives were, or their likely outcomes. Most importantly, Dr. Penn conceded that he was unaware of a case similar to Plaintiff's where a second surgery was not recommended. Further, it is undisputed that no neurosurgeon even evaluated Plaintiff for surgery based on the 1997 MRI findings, an evaluation which, according to Dr. Wilberger, was required under the standard of care.

Determining whether physicians violated the proper standard of care is a fact-specific inquiry, in which case law may provide little guidance. The court notes, however, that Illinois courts have upheld jury verdicts in favor of plaintiffs in circumstances similar to those presented here. For example, in *Moore v. Anchor Organization for Health Maintenance*, 284 Ill.App.3d 874, 876-79, 672 N.E.2d 826, 829-30 (1st Dist. 1996), the Illinois appellate court upheld a jury finding that the plaintiff's doctors unreasonably delayed performing surgery to remove an arachnoid cyst which was crushing plaintiff's spinal cord. The plaintiff had long suffered from ankylosing spondylitis, a progressive, degenerative disease of the spine and joints which destroys cartilage and causes bones to fuse together. Although plaintiff complained to his doctor of muscle spasms in November and December 1988, his doctor did not examine him or refer him to a neurologist, instead simply prescribing a sedative. Plaintiff saw a rheumatologist in January 1989, complaining of even more severe muscle spasms, but still was not referred to a neurologist. Only after a fourth visit to a doctor in March 1989 was plaintiff referred to a neurologist who diagnosed a cyst on his spine. As a result of the cord compression caused by the delay in removing the cyst, the plaintiff was rendered unable to walk independently and became essentially paraplegic. *Id.* Although defendants raised many issues on appeal, they did not seek to reverse the jury's conclusion that

the standard of care had been breached, focusing instead on whether plaintiff met his burden of proving proximate cause.

Based on a review of all the evidence, the court concludes that the appropriate standard of care in this case was breached. First, when Dr. Garmon observed Plaintiff's symptoms in April 1997, she should have followed up to make sure that Plaintiff was examined by a neurologist. The fact that she referred the Plaintiff to Dr. Orfei in 1995 but did not do so in 1997, when the Plaintiff exhibited similar conditions, supports the conclusion that Dr. Garmon acted negligently in not following through with her patient's care. The Defendant places much emphasis on Plaintiff's failure to make all of her scheduled appointments over several years, but this really serves to highlight how important it was for Dr. Garmon to ensure that Plaintiff was receiving the care she needed. Her failure to follow up arguably constitutes further evidence of her negligence.

Dr. Orfei also violated the standard of care when she failed to ensure that a neurosurgeon examine the results of Plaintiff's December 1997 MRI. Notably, Dr. Penn's testimony that several neurosurgeons would have different views on how to treat the Plaintiff underscores the determination that it should be a *neurosurgeon*, not a neurologist, who ultimately decides on the patient's care. After Dr. Orfei observed the alarming results of Plaintiff's December 1997 MRI, it was a breach of care to determine, without referral to a neurosurgeon, that surgery was not a viable option for her. Dr. Orfei was also negligent in coming to these conclusions regarding the Plaintiff without carefully examining her medical history, which would have shown Plaintiff's positive response to the first surgery performed in 1995.

Finally, assuming Plaintiff saw Dr. McGregor on October 27, 1997, the court concludes that the standard of care required him to order an MRI himself, or contact Dr. Orfei to see if Westside staff had performed one. The government did not dispute Dr. Wilberger's testimony that without the results of an MRI or a myelogram, a neurosurgeon could not have made an informed decision about whether surgery was appropriate. Indeed, Dr. Orfei confirmed that without seeing an MRI,

20

Dr. McGregor could not have made an informed decision about surgery.

It is worth noting that the absence of records does nothing to shore up the government's case. The government's own expert characterized the absence of these as deplorable, and testified candidly that the VA was negligent in its record keeping in this case. (Testimony of Dr. Penn.) In any event, even without complete records, it is undisputed that Plaintiff was not offered surgery by any of her doctors in 1997 or early 1998, and Plaintiff has shown that this was the appropriate medical treatment for her condition at that time.

**B.      Whether the Breaches Proximately Caused the Plaintiff's Injury**

To establish proximate cause, the plaintiff must prove that the defendant's negligence "more probably than not" caused her injury. *Borowski v. Von Solbrig,* 60 Ill.2d 418, 424, 328 N.E.2d 301, 305 (1975). In *Holton v. Memorial Hospital,* 176 Ill.2d 95, 110-11, 679 N.E.2d 1202, 1209 (1997), the Illinois Supreme Court approved a jury instruction stating that the defendant's negligence need only be a cause of the harm, or "any cause which, in the natural or probable sequence, produced the injury" of the plaintiff, not "the only cause, or the last nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury." Illinois Pattern Jury Instruction, Civil, No. 15.01 (3d ed. 1995).

Whether the defendant's negligent treatment is a proximate cause of a plaintiff's ultimate injury is a question of fact. *Holton,* 176 Ill.2d at 107, 679 N.E.2d at 1207. Plaintiff here contends that the failure of her physicians to take her deteriorating condition seriously was a proximate cause of her subsequent paralysis. The record supports this theory. Dr. Wilberger testified that the combined inaction of Plaintiff's doctors deprived her of the opportunity for an intervention which, in his opinion, more likely than not would have stabilized her condition, and might even have improved it. Dr. Wilberger testified that in 70-80% of similar cases, patients' conditions stabilize after surgery, and in 10% of cases, patients actually improve. Dr. Penn did not refute this

21

testimony. He merely observed that there was a risk that surgery would have harmed the Plaintiff. This assertion does not defeat Plaintiff's case, however. The Plaintiff is not required to prove that the surgery would have been successful; instead, she need only establish that the government's negligence was the probable cause of her further deterioration. *See Holton,* 176 Ill.2d at 107, 679 N.E.2d at 1207 ("The 'better result test' is not a part of plaintiff's burden of proof.") Here, if her physicians had met the standard of care required, they would have advised the Plaintiff to have surgery, which would have given her a good chance at stabilizing her condition and keeping her from losing all feeling in her legs and right arm. Indeed, the government's own expert did not testify that surgery would not have helped the Plaintiff.

This theory of proximate cause has been referred to by Illinois courts as the "lost chance doctrine." Under this theory, courts have found plaintiff meets the burden of establishing proximate cause if she can show to a reasonable degree of medical certainty that the defendant's conduct proximately increased the risk of harm or lost chance of recovery. *Meck v. Paramedic Services of Illinois,* 296 Ill.App.3d 720, 722, 695 N.E.2d 1321, 1323 (1st Dist. 1998), citing *Holton,* 176 Ill.2d at 119, 679 N.E.2d 1202. The doctrine is based on the standard articulated in the Restatement (Second) of Torts, section 323 (1965):

> One who undertakes to render services to another which he should recognize as necessary for the protection of the other's person is subject to liability to the other for physical harm from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

In *Holton,* the Supreme Court of Illinois affirmed a jury verdict that the hospital's negligence proximately caused the plaintiff's paralysis. Plaintiff in *Holton,* upon admission to the hospital, rapidly lost feeling her in legs. She informed her attending nurses, some of whom observed her fall on the way to the bathroom, but because the nurses did not view her symptoms as dramatic changes from when she was admitted, they did not notify plaintiff's doctor. *Holton,* 176 Ill.2d at 100-01, 679 N.E.2d at 1204-05. It was only when the plaintiff lost bowel and bladder control that

a nurse informed her doctor of her condition, and by then the patient had suffered a complete loss of motor control below her waist. Because the nurses attending the plaintiff failed to timely notify her doctor about her condition, her doctor made erroneous diagnosis and treatment decisions based upon inaccurate and incomplete information regarding the patient's condition in the hours preceding her total loss of motor control. *Holton,* 176 Ill.2d at 108, 679 N.E.2d at 1208.

In this case, because Plaintiff's doctors failed to comprehensively treat and assess her condition, the appropriate treatment was not even considered. Unlike *Holton,* where the nursing staff failed to act promptly, here it was the doctors' own breach of the standard of care that caused Plaintiff's injury: Dr. Orfei declined to look up her medical history between November 1993 and April 1997, and she did not send her MRI results to a neurosurgeon. Dr. McGregor, the neurosurgeon, did not ask for an MRI, which Dr. Wilberger and Dr. Orfei testified was necessary to make an informed decision. These actions undoubtedly led to the decision not to operate on the Plaintiff a second time, and Defendant has not rebutted the evidence that Plaintiff suffered the loss of a good chance of retaining function as a result. For these reasons the court finds the government liable under Count One.

## C.    Spoliation Claim

Plaintiff's second count alleges that the government negligently lost her medical records. To demonstrate negligent spoliation in Illinois, a plaintiff must show a duty to preserve records, a breach of that duty, an injury caused by that breach, and damages. *Cosgrove v. Commonwealth Edison Co.,* 315 Ill.App.3d 651, 657, 734 N.E.2d 155, 161 (2d Dist. 2000). In general, there is no duty to preserve evidence; however, such a duty may arise through an agreement, a contract, a statute, a "special circumstance," or by affirmative conduct. *Id.* The court assumes that VA medical staff had a duty to preserve Plaintiff's medical records. To prevail on her spoliation claim, however, Plaintiff must show that the loss or destruction of evidence caused her to be unable to

prove an underlying lawsuit. *Boyd v. Travelers Ins. Co*, 166 Ill.2d 188, 196, 652 N.E.2d 267, 271 (1995). Because the court has ruled in Plaintiff's favor on Count One, it will dismiss her spoliation claim as moot.

**D.    Plaintiff's Damages Award**

Illinois law defines "economic loss" as tangible damages, such as damages for past and future medical expenses, loss of income or earnings, and other property loss. 735 ILCS 5/2-1115.2(a). "Non-economic loss" refers to intangible damages, including pain and suffering, disability, disfigurement, loss of consortium, and loss of society. 735 ILCS 5/2-1115.2(b). Plaintiff here seeks relief in the form of economic damages for past and future medical and care. She estimates those damages as $3,100,000 to $3,500,000. She also seeks an award of non-economic damages for pain and suffering ($3,000,000) and disability and disfigurement ($4,500,000).

This case presents a challenge to a finder of fact trying to award an appropriate remedy. Plaintiff was already in a degenerative state before her doctors' negligent treatment. However, the Seventh Circuit has suggested a method of determining damages in circumstances such as this. Referred to as the "loss of chance" doctrine, it relates to the doctrine of the same name discussed by the Illinois Supreme Court in *Holton*. The *Holton* Court explained that "lost chance" or "loss of chance" in medical malpractice actions refers to the injury sustained by a plaintiff whose medical providers are alleged to have negligently deprived the plaintiff of a chance to survive or recover from a health problem, or where the malpractice lessened the effectiveness of treatment or increased the risk of an unfavorable outcome to the plaintiff. 176 Ill.2d at 111, 679 N.E.2d at 1209. In *Doll v. Brown,* an employment discrimination case, the Seventh Circuit offered the following rule for applying the "lost chance" doctrine to damage awards:

> The trier of fact will estimate the probability that the patient would have survived but for the physician's negligence – say it is 25 percent – and will award that percentage

24

> of the damages the patient would have received had it been certain that he would
> have survived but for the negligence.

75 F.3d 1200, 1205-06 (7th Cir. 1996). *See also Bishop v. Gainer,* 272 F.3d 1009, 1016 (7th Cir.

2001) (commending consideration of the lost chance theory of damages to the bench and bar as

a possible method of arriving at equitable results in employment discrimination cases). The court

in *Doll* noted that this theory has traditionally been applied to medical malpractice cases. 75 F.3d

at 1206, *citing Bach v. Trident Steamship Co.,* 920 F.2d 322, 327 (5th Cir.), *vacated on other*

*grounds,* 500 U.S. 949 (1991).

In light of the Illinois Supreme Court's endorsement of the loss of chance doctrine in *Holton,*

adopting the Seventh Circuit's suggestion in *Doll* strikes the court as a logical solution to the difficult

issue of determining what damages are appropriate here. Given Dr. Wilberger's undisputed

testimony that surgery would have given Plaintiff a 70-80 percent chance of halting further

deterioration, she will be entitled to that same percentage of the total damage award. In other

words, her damage award should be reduced by 20-30 percent. The court will take the average

and reduce Plaintiff's damages award by 25 percent.

### 1. Economic Loss

Plaintiff has requested the following relief for economic loss. First, she requests $25,095.00

for past caretaking expenses incurred at Warren Park. (Pl.'s Ex. 22.) Second, Plaintiff seeks an

award for expected future medical and nursing expenses in the range of $3,100,000 to $3,500,000.

According to testimony at trial by Charles Linke, an economist and expert witness, Plaintiff's

expenses for future care will range from $1,714,669 for continued care in a nursing home, to

$3,515,926 if she were to reside in a private home with a caregiver as she desires to. (Plaintiff's

Trial Brief on Damages at 12, hereinafter "Pl.'s Damages Brief".) Plaintiff testified that she desires

to live in a private home, hoping for more privacy and to regain the dignity she lost at Warren Park.

To accommodate this wish, Plaintiff requests an award of $100,000 for the purchase and

renovation of a single-family house. (Pl.'s Damages Brief at 12.) The figure is the sum of two one-time expenses: $65,000 to purchase a house with a market value of $139,900,[14] and $35,000 for architectural improvements to accommodate Plaintiff's needs.[15] (Id.)

The government has not challenged these calculations, but does argue that damages for possible future injury are not compensable unless they are reasonably certain to occur and only if it can be shown to a reasonable degree of certainty that the risk was proximately caused by the government's negligence. Since the government submitted its brief, the Illinois Supreme Court stated in Dillon v. Evanston Hospital, 199 Ill.2d 483, 503-04, 771 N.E.2d 357, 370 (2002), that while the Court historically declined to award damages for future injuries, the Court would recognize damages for increased risk of future injury if the plaintiff can prove such a risk was caused by the defendant. "A plaintiff can obtain compensation for a future injury that is not reasonably certain to occur, but the compensation would reflect the low probability of occurrence." Id.

It is undisputed that Plaintiff will be in a wheelchair and will require constant medical attention for the remainder of her life, which at the time of trial was estimated at 26 years. The only "potential complications" cited in the Life Care Plan drawn up by Plaintiff's expert Buddy Brennan are the risk of ulcers requiring decubitus closure and urinary tract infections. While there was testimony at trial regarding the Plaintiff's increased risk of contracting ulcers and urinary tract infections, the Life Care Plan does not denote the Plaintiff's numerical risk, making it difficult for the court to compute the amount that should be awarded for Plaintiff's loss. Brennan estimates that Plaintiff will contract one or two ulcers over the course of her life, and ten to twenty urinary tract infections. Because Plaintiff has offered no proof of this risk, the court declines to award damages

---

[14]     This difference accounts for the fact that the house will presumably still have value once Plaintiff passes away or moves out.

[15]     This figure is the median of an estimate by Plaintiff's expert, Buddy Brennan that the renovations would cost between $20,000 and $50,000.

for these potential future injuries. The court will subtract the cost of treating one ulcer ($10,000) and ten urinary tract infections lasting ten days ($7,500) from Plaintiff's total damages.

The cost of Plaintiff's expenses at Warren Park is undisputed and the Court awards her damages in the amount of $18,821.25 (75 percent of $25,095). The court is also prepared to make an award for Plaintiff's expected future medical and caretaking expenses, but notes an uncertainty about the calculation of this expense. Neither party has explicitly addressed Plaintiff's entitlement to future medical care through the VA. As this court understands Mr. Brennan's testimony, the Life Care Plan's prepared estimates list the market rate for various medical necessities. If Plaintiff receives at least some of her care at the VA, presumably her costs will be lower than the market rate. The court recognizes that the VA may not cover all of Plaintiff's expenses, such as a 24-hour nurse, and will adjust Plaintiff's damages award accordingly after considering additional submissions from the parties concerning VA coverage of any of Plaintiff's medical necessities. Depending on new evidence submitted by the parties, the court will award at most $2,307,500 (75 percent of $3,100,000, with $17,500 in future injury damages subtracted).

Plaintiff explained in matter-of-fact but very moving terms the effect that living in a nursing home has had on her dignity. Her testimony demonstrated to the court that her confinement at Warren Park has caused daily humiliation and a loss of personal privacy. She also will have few opportunities for interaction with peers, as she is much younger than most of the Warren Park residents. The court is persuaded by her request for an award that would enable her to move out of the nursing home and into a private home where she would receive 24 hour nursing care. The court therefore awards $75,000 for the purchase and renovation of a home (applying the loss of chance doctrine, seventy-five percent of $100,000).

### 2. Non-economic Loss

Plaintiff requests $3,000,000 in pain and suffering to account for the four years leading up

to trial and the next 26 years she is expected to live. (Pl.'s Damages Brief at 17.) At trial, Plaintiff, her son, and Dr. Scheinman all testified to the constant pain Plaintiff suffers. Plaintiff testified that her current level of pain is much worse than it was prior to her decline which started in 1997. She testified that she has pressure sores as a result of being forced to sit in a wheelchair (although she has no feeling left in her legs, she does retain sensation in her buttocks). In addition to physical pain, Plaintiff testified to the daily mental suffering she endures as a result of the physical pain, her inability to perform everyday functions, and the loss of her ability to travel and visit her sons and grandchildren. (Pl.'s Damages Brief at 16.)

Plaintiff also argues that she deserves $4,500,000 for disability and disfigurement. (Pl.'s Damages Brief at 19.) There was ample trial testimony about Plaintiff's disabilities: she cannot accomplish most everyday tasks without significant assistance and is dependent on nurses to help her eat, dress, bathe, and use the toilet. Her doctors agreed that she will most likely spend the rest of her life in a wheelchair, with no ability to use her legs. Her ability to sense heat and cold is severely diminished. The skills she maintains in her left hand are diminishing, making it even more difficult for Plaintiff to accomplish the most mundane tasks. As of October 1997, Plaintiff points out she was able to stand, walk, draw, write, eat, use a fork and knife, attend doctor appointments on her own, bathe, dress herself, shop, cook, use the bathroom on her own and visit her children. (Pl.'s Damages Brief at 19.) Today she is unable to do any of these things without assistance.

In *Jutzi-Johnson v. United States*, 263 F.3d 753 (7th Cir. 2001), a Federal Tort Claims Act case applying Illinois law, Judge Posner recognized the difficulty in determining the value of pain and suffering and concluded that in order to "minimize arbitrary variance in awards . . . the trier of fact should . . . be informed of the amounts of pain and suffering damages awarded in similar cases." *Id.* at 758-59.[16] Although the opinion addressed only pain and suffering damages, the

---

[16]     The court notes it is unclear whether Illinois courts would adhere to this approach, (continued...)

court feels that disability and disfigurement damages are analogous due to their intangible nature. The court therefore briefly reviews recent awards in cases similar to this one.

First, in *Levy v. Amine* (tried in 1999), a jury awarded $7,000,000 to a medical malpractice plaintiff, whose doctors failed to promptly perform surgery after the plaintiff was stabbed in the back with a knife in February 1985. Law Bulletin Information Network, Case No. 94L-8154. In March 1985 plaintiff went to his doctor for a follow-up and complained of bowel and bladder problems. Defendant prescribed a foot brace (apparently plaintiff had foot problems as well) and told plaintiff to return in six months. During those six months, plaintiff's condition deteriorated to the point that when he returned to the doctor in September 1985, he had mild bilateral weakness, spasticity, abnormal reflexes and increased bowel and bladder complaints. Surgery was performed in October 1985, at which point it was discovered that his spinal cord had become tethered to the dura (the fibrous membrane forming the outer covering of the central nervous system). Within days of surgery, plaintiff became a paraplegic without any bowel, bladder or sexual function. The jury rejected the defendant's argument that the patient had no symptoms indicating the need for surgery at an earlier date, or that additional testing and follow-up would not have led to a decision to perform surgery earlier. This case is probably the most analogous to the one at hand, given the failure of Plaintiff's doctors in this case to timely treat her symptoms.

In *Richardson v. Chapman,* 175 Ill.2d 98, 113, 676 N.E.2d 621, 628 (1997), the Illinois Supreme Court upheld a verdict of $4.6 million in pain and suffering, $3.5 million in disability, and $2.1 million in disfigurement damages in circumstances arguably more extreme than those presented here. In that case, a flight attendant was only 23 years old when an automobile accident

---

[16](...continued)
see *Richardson v. Chapman,* 175 Ill.2d 98, 114, 676 N.E.2d 621, 628-29 (Ill. 1997) (noting that Illinois courts have traditionally declined to compare awards), but the Seventh Circuit has counseled it and the court finds the approach helpful in determining whether Plaintiff's reward is appropriate.

rendered her an "incomplete quadriplegic," that is, unable to use her legs, having only limited functioning in her arms, suffering constant pain in her legs and shoulders, and lacking any control over her bladder or bowel functions.

In *Richter v. Diamond Headache Clinic*, an Illinois jury in 1986 awarded plaintiff $15,000,000, although the report does not indicate what portion covered pain and suffering. The defendant in that case negligently caused the plaintiff to suffer a stroke which caused parasthesia on one side of her body and partial blindness in both eyes, necessitating 24-hour nursing care. Plaintiff's mind was fully functioning and she was completely cognizant of what had happened to her and the transformation she had undergone. Nat'l Jury Verdict Review and Analysis, Case No. 80L6203. Here, similarly, Plaintiff's testimony reflected that she is painfully aware on a daily basis of her humiliating dependency on others at an age when she is expected to be active and productive.

In *Womack v. Leff*, 2001 WL 1518955, Docket No. 98-29131 (Non-Jury Verdict, Dade County, Fl. May, 2001), a 52-year old paraplegic female suffered aggravation of her preexisting paralysis, which additionally restricted the use of her right arm, numbness of her left leg, and bowel dysfunction, when she fell from her wheelchair while being pushed up an uneven wheelchair ramp at the defendant's mall where she was a patron. Plaintiff agreed to a settlement for $425,000.

Finally, in *Kresin v. Sears, Roebuck and Co.*, 316 Ill.App.3d 433, 434, 736 N.E.2d 171, 173 (1st Dist. 2000), the court upheld a jury verdict totaling $15,691,690, which included $2,000,000 for disfigurement, for injuries sustained by a 73-year old woman struck by the driver of a Sears van backing out of the Sears Automotive Center in St. Charles, Illinois. The injury left plaintiff unable to straighten her left elbow and so contorted her hand that it is permanently fixed in a claw-like position. She also suffered paralysis in her left leg. The court concluded in its review that these injuries certainly affect her appearance and constitute sufficient disfigurement to justify the jury's large award.

Because these cases involve injuries roughly analogous to those suffered by Plaintiff, and yet yield an array of results, they do not provide unequivocal direction. They demonstrate, however, that the amount Plaintiff seeks here is not unreasonable. The court recognizes that awarding Plaintiff a sum that will allow her to live in a private home should significantly reduce the amount of suffering Plaintiff endures. Furthermore, Plaintiff's age should be considered, as she is somewhat older than plaintiffs in the cases summarized above, other than in *Kresin*. See *Kinzinger v. Tull,* 329 Ill.App.3d 1119, 1128, 770 N.E.2d 246, 253 (4th Dist. 2002) (in considering whether a damages award is excessive, a reviewing court must look at several factors, including the plaintiff's age). Given that Plaintiff was already in a somewhat degenerative state prior to the alleged malpractice, and was already experiencing some degree of pain and suffering, the court reduces Plaintiff's award from $3,000,000 to $2,000,000, with an additional 25 percent subtracted under the loss of chance doctrine, for a sum of $1,500,000.

With regard to Plaintiff's claim for disability and disfigurement, it is true that Plaintiff is almost entirely dependent on others to perform even the most basic functions, dressing herself, cutting food, and using the bathroom. The fact that the court upheld a jury award of $2,000,000 in disfigurement in *Kresin* for a 73-year old woman supports the reasonableness of Plaintiff's request. The government points out that it should be liable only for additional disability suffered after December 1997, and the court agrees. It is important that Plaintiff's award reflect only the increased disability and disfigurement suffered as a direct result of Defendant's negligence, and not from her pre-existing condition. Therefore, the court deems it appropriate to award Plaintiff $2,250,000 (an award of $3,000,000, down from Plaintiff's requested $4,500,000, with 25 percent subtracted under the loss of chance doctrine.)

## CONCLUSION

The court finds in favor of Plaintiff on her medical negligence claim and awards her

$3,843,821.25 ($18,821.25 in reimbursement, $75,000 for a new home and improvements, $1.5 million in pain and suffering, and $2.25 million in disability and disfigurement). The court reserves judgment on Plaintiff's remaining economic loss, pending further information from the parties. The court finds for Defendant on Plaintiff's spoliation claim and dismisses that claim as moot.

ENTER:

Dated: March 11, 2003

REBECCA R. PALLMEYER
United States District Judge